United States District Court
Southern District of Texas
FILED

DEC 1 3 2011

David J. Bradley, Clerk of Court



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | Criminal No. |
| | § | |
| v. | § | |
| | § | **UNDER SEAL** |
| MANSOUR SANJAR, | § | |
| CYRUS SAJADI and | § | H 11 -861 |
| CHANDRA NUNN, | § | |
| | § | |
| Defendants. | § | |

## INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

1.      The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b).

2.      Medicare was subdivided into multiple Parts.  Medicare Part B covered partial hospitalization programs ("PHPs") connected with the treatment of mental illness.  The treatment program of PHPs closely resembled that of a highly structured, short-term hospital inpatient program, but it was a distinct and organized intensive treatment program that offered less than 24-hour daily care.

3.      Patients eligible for Medicare coverage of a PHP comprised two groups:  (1) those patients who were discharged from an inpatient hospital treatment program, and the PHP

was in lieu of continued inpatient treatment and (2) those patients who, in the absence of partial hospitalization, would require inpatient hospitalization.

4.    Medicare guidelines required that patients admitted to a PHP required PHP services at levels of intensity and frequency comparable to patients in an inpatient setting for similar psychiatric illnesses.

5.    Under the PHP benefit, Medicare covered the following services: (1) individual and group psychotherapy with physicians, psychologists, or other mental health professionals; (2) occupational therapy requiring the skills of a qualified occupational therapist; (3) services of social workers, trained psychiatric nurses, and other staff trained to work with psychiatric patients; (4) drugs and biologicals furnished for therapeutic purposes that could not be self-administered; (5) individualized activity therapies that were not primarily recreational or diversionary; (6) patient education programs where the educational activities were closely related to the care and treatment of the patient; and (7) diagnostic services.

6.    Medicare guidelines specifically excluded meals and transportation from coverage under the PHP benefit.

7.    Medicare did not cover programs providing primarily social, recreational, or diversionary activities. Medicare excluded from coverage programs attempting to maintain psychiatric wellness and treatment of chronic conditions without acute exacerbation. Psychosocial programs that provided only a structured environment, socialization, or vocational rehabilitation were not covered by Medicare.

8.    Medicare required that the PHP was provided at a facility that is hospital based or hospital affiliated or at a community mental health center ("CMHC"), which was a provider type under Part A of Medicare.

9.     Individuals who qualified for Medicare benefits were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a Medicare identification number.

10.     CMHCs, physicians and other healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A healthcare provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

11.     Medicare paid CMHCs and other healthcare providers for services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

12.     CMS contracted with Medicare Administrative Contractors ("MACs") to process claims for payment. The MAC that processed and paid Medicare Part B claims for PHP services in Texas was TrailBlazer Health Enterprises, LLC ("TrailBlazer").

13.     To bill Medicare for services rendered, a provider submitted a claim form (Form 1500) to TrailBlazer. When a Form 1500 was submitted, usually in electronic form, the provider certified that:  (1) the contents of the form were true, correct and complete; (2) the form was prepared in compliance with the laws and regulations governing Medicare; and (3) the contents of the claim were medically necessary.

14.     A Medicare claim for PHP reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the item or service provided to the beneficiary, the date that the item or service was provided, the cost of the item or

service and the name and unique physician identification number of the physician who prescribed or ordered the item or service.

15.　　Spectrum Care P.A. ("Spectrum") was a Texas business entity doing business at 6100 Richmond, Suite 120, Houston, Texas. Spectrum billed Medicare for PHP services that were not medically necessary and, in some cases, not provided.

16.　　Defendant **MANSOUR SANJAR**, a resident of Harris County, Texas, was a co-owner and operator of Spectrum.

17.　　Defendant **CYRUS SAJADI**, a resident of Harris County, Texas, was a co-owner and operator of Spectrum.

18.　　Defendant **CHANDRA NUNN**, a resident of Harris County, Texas, owned a Houston assisted living facility ("ALF") and was a Medicare beneficiary recruiter for Spectrum.

**COUNT 1**
**Conspiracy to Commit Health Care Fraud**
**(Violation of 18 U.S.C. § 1349)**

19.　　Paragraphs 1 through 18 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

20.　　From in or around September 2006, through the present, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, defendants,

**MANSOUR SANJAR,**
**CYRUS SAJADI**
and
**CHANDRA NUNN,**

did knowingly and willfully combine, conspire, confederate and agree with each other and with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a healthcare benefit program affecting

4

commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery of and payment for healthcare benefits, items and services.

## Purpose of the Conspiracy

21.    It was a purpose of the conspiracy for the defendants and others to unlawfully enrich themselves by (a) submitting false and fraudulent claims to Medicare, (b) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of proceeds from the fraud, and (c) diverting proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

## Manner and Means of the Conspiracy

The manner and means by which the defendants sought to accomplish the purpose and object of the conspiracy included, among other things:

22.    Defendants **MANSOUR SANJAR** and **CYRUS SAJADI** would maintain a valid Medicare provider number for Spectrum to submit claims to Medicare for PHP services that were not medically necessary and, in some cases, not provided.

23.    Defendants **MANSOUR SANJAR** and **CYRUS SAJADI** would control the day-to-day operations of Spectrum.

24.    Defendants **MANSOUR SANJAR** and **CYRUS SAJADI** would pay and cause the payment of kickbacks to recruiters and owners of ALFs, including **CHANDRA NUNN**, in exchange for ALFs delivering Medicare beneficiaries housed at their facilities to Spectrum.

25.    Defendants **MANSOUR SANJAR, CYRUS SAJADI** and **CHANDRA NUNN** would pay and cause the payment of kickbacks in cash and cigarettes to Medicare beneficiaries in exchange for those beneficiaries attending Spectrum.

26.    Defendant **CHANDRA NUNN** would recruit beneficiaries to Spectrum so that claims for medically unnecessary PHP services could be submitted to Medicare by **MANSOUR SANJAR** and **CYRUS SAJADI**.

27.    Defendants **MANSOUR SANJAR** and **CYRUS SAJADI** would submit and cause to be submitted claims to Medicare for PHP services that were not medically necessary and, in some cases, were not provided.

28.    Defendants **MANSOUR SANJAR** and **CYRUS SAJADI** would submit and cause to be submitted claims to Medicare for PHP services when patients were actually watching television and movies, playing bingo and engaging in other non-PHP activities instead of receiving therapy.

29.    Defendants **MANSOUR SANJAR** and **CYRUS SAJADI** would submit and cause to be submitted approximately $90.4 million in claims to the Medicare program for PHP services purportedly provided by Spectrum, when in fact, such PHP services were not medically necessary and, in some cases, never provided.

30.    After payments from Medicare were deposited into Spectrum bank accounts, defendants **MANSOUR SANJAR** and **CYRUS SAJADI** would transfer proceeds of the fraud to themselves and their co-conspirators.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Defraud the United States and to Pay Health Care Kickbacks
### (18 U.S.C. § 371)

31.    Paragraphs 1 through 18 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

32.    From in or around September 2006, through the present, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, the defendants,

**MANSOUR SANJAR,**
**CYRUS SAJADI**
and
**CHANDRA NUNN,**

did knowingly and willfully combine, conspire, confederate and agree with each other and with others known and unknown to the grand jury, to commit certain offenses against the United States, that is,

a.  To defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program;

b.  to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal

health care program, that is, Medicare; and

c.  to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

## Purpose of The Conspiracy

32.  It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by paying and receiving kickbacks and bribes in exchange for providing Medicare beneficiary information that was used to submit claims to Medicare.

## Manner and Means of The Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

33.  Paragraphs 22 through 30 contained in Count One of this Indictment are realleged and incorporated by reference as if fully set forth herein.

## Overt Acts

34.  In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas, the following overt acts:

8

a.      Defendant **MANSOUR SANJAR** made payable check number 2187, dated November 30, 2010, from a Spectrum bank account to defendant **CHANDRA NUNN** in the amount of $10,000 in payment for referring beneficiaries from **CHANDRA NUNN's** ALF to Spectrum for PHP services.

b.      Defendants **MANSOUR SANJAR** and **CYRUS SAJADI** made payable check number 2198, dated December 8, 2010, from a Spectrum bank account to defendant **CHANDRA NUNN** in the amount of $300 in payment for referring beneficiaries from **CHANDRA NUNN's** ALF to Spectrum for PHP services.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

35.     Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendants **MANSOUR SANJAR**, **CYRUS SAJADI** and **CHANDRA NUNN**, that, in the event of conviction for any of the violations charged in Counts One and Two of the Indictment, the United States intends to forfeit all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of any such offense, including, but not limited to, a money judgment in the amount of at least $6,561,049.00 in United States currency, for which the defendants may be jointly and severally liable.

36.     In the event that the property subject to forfeiture as a result of any act or omission of a defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendants up to

the total value of the property subject to forfeiture, pursuant to Title 21, United States Code,

Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

ORIGINAL SIGNATURE ON FILE

FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

LAURA M.K. CORDOVA
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE